241 Corporation, New York, New York v. Commissioner.
241 Corp. v. Commissioner
Docket No. 54214.
United States Tax Court
T.C. Memo 1956-174; 1956 Tax Ct. Memo LEXIS 119; 15 T.C.M. (CCH) 901; T.C.M. (RIA) 56174; July 25, 1956
*119 Held, petitioner is not entitled to deduct amounts which it accrued as interest on advances made to it by its stockholders since such advances constituted contributions to capital rather than loans. Bernard Weiss, Esq., for the petitioner. Charles B. Markham, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income tax determined against petitioner for the fiscal years ended June 30, 1947, and June 30, 1948, in the amounts of $5,794.98 and $6,246.48, respectively. The sole issue to be decided is whether petitioner is entitled to deduct, under section 23(b) of the 1939 Code, amounts which it accrued as interest on advances made to it by its stockholders. If this issue is decided in the affirmative, petitioner *120 will be entitled to carry forward its net operating loss for the fiscal year ended June 30, 1946, and it will have a net operating loss deduction for the taxable years ended June 30, 1947, and June 30, 1948. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner is a corporation organized on July 30, 1945, under the laws of the State of New York. It filed its Federal income tax returns for the fiscal years ended June 30, 1946, June 30, 1947, and June 30, 1948, on an accrual basis, with the then collector of internal revenue for the third district of New York. Petitioner was organized by a group of individuals for the purpose of taking title to certain real property located at 241 and 248 Central Park West, New York, New York. These individuals were: Samuel Rudin, Edward Rudin, Jacob R. Schiff, Manuel G. Sydney, and Seymour H. Gross. The Rudins, brothers, are engaged exclusively in the real estate business. Until his death in 1949, Schiff, an attorney, was engaged principally in the lending of second mortgage money to holders of real estate. Gross and Sydney are partners in the manufacture *121 of ladies' dresses. With the exception of the Rudins, none of these persons are related. The total purchase price of the properties, exclusive of adjustments, was $1,842,478.27. It had been the intention of the Rudins, who conceived the idea of organizing petitioner, to limit the amount of money which they and the other stockholders would have to advance in order to acquire and operate the Central Park West properties to a total of $50,000, of which $3,000 was to be considered as capital and $47,000 as a loan. They planned to have petitioner assume existing first mortgages on the properties, aggregating $1,542,478.27, and to raise the balance of the purchase price by means of a $250,000 second mortgage. To this end they sought the aid of Jacob Schiff who agreed to participate in the venture and to obtain a $250,000 second mortgage for petitioner. On the basis of Schiff's promise, a preliminary contract for the purchase of these apartment buildings was written on June 1, 1945, and the participants placed a $20,000 deposit on the property. In July or August 1945, Schiff found that the largest second mortgage which he could obtain on the properties was $150,000. The participants decided *122 to proceed with the purchase by increasing the amount which they would advance from $50,000 to $150,000. Of this sum, $3,000 was to be capital and $147,000 was to be regarded as a loan. Petitioner issued 30 shares of capital stock with a par value of $100 each, and its stockholders subscribed to such shares and made additional advances in the following amounts: Capital
Number of
Additional
Shares
Amount
Advances
Samuel Rudin
5
$ 500
$ 24,500
Edward Rudin
5
500
24,500
Manuel G. Sydney
5
500
24,500
Seymour H. Gross
5
500
24,500
Jacob R. Schiff
10
1,000
49,000
Total
30
$3,000
$147,000
The purchase price of the properties was derived from the following sources: Assumed 4 1/2% First Mortgage on
241 Central Park West, held by
Consolidated Realty Corp., due
July 31, 1954
$1,524,728.27
Assumed 5% First Mortgage on
248 Central Park West, held by
Thompson, Koss, Warren & Hew-
itt, due July 1, 1954
17,750.00
Blanket Second Mortgage to Stand-
ard Factors Corporation, with in-
terest at 10%, due August 1, 1946
150,000.00
Capital Stock
3,000.00
Additional Advances
147,000.00
Total
$1,842,478.27
The *123 stockholders intended that petitioner repay all advances out of earnings before July 31, 1954, which was the due date of the $1,524,728.27 mortgage held by Consolidated Realty Corporation. They feared that this mortgage would not be renewed and that, if another mortgage could not be obtained, their total investment in the property would be lost. They estimated that all advances to petitioner could be repaid out of earnings by 1950 or 1951. The corporation minutes of August 1, 1945, include the following resolution: "On motion duly made, seconded and unanimously carried, it was "FURTHER RESOLVED that the corporation borrow such additional moneys as it may require from time to time from Jacob R. Schiff, Samuel Rudin, Edward Rudin, Seymour H. Gross and Manuel G. Sydney, for the purpose of carrying on its regular business, and any such loans shall bear interest at the rate of 10% per annum." In addition to the $147,000 referred to above, petitioner received the following amounts from its stockholders, on the indicated dates, in accordance with the needs of the business. The figures in parentheses indicate repayments of such amounts: S. & E.
Date
Rudin
J. R. Schiff
S. H. Gross
M. G. Sydney
Aug. 1945
$3,125.34
$ 3,125.34
$1,562.67
$1,562.67
Dec. 1945
2,500.00
2,500.00
1,250.00
1,250.00
Nov. 1946
5,000.00
5,000.00
2,500.00
2,500.00
May 1947
7,500.00
June 1947
2,500.00
1,250.00
1,250.00
June 1947
(7,500.00)
July 1947
2,500.00
Aug. 1947
(2,500.00)
(2,500.00)
(1,250.00)
(1,250.00)
Feb. 1948
10,000.00
Apr. 1948
(10,000.00)
5,000.00
5,000.00
July 1948
(5,000.00)
(5,000.00)
*124 On the dates indicated below, petitioner's books showed the following amounts as loans payable to stockholders: J. R.
S. H.
M. G.
Date
Total
S. Rudin
E. Rudin
Schriff
Gross
Sydney
8/1/45
$147,000.00
$24,500.00
$24,500.00
$49,000.00
$24,500.00
$24,500.00
6/30/46
163,876.02
27,312.67
27,312.67
54,625.34
27,312.67
27,312.67
6/30/47
182,876.02
29,812.67
29,812.67
62,125.34
31,062.67
31,062.67
6/30/48
178,876.02
29,812.67
29,812.67
59,625.34
34,812.67
34,812.67
The aforementioned advances were not evidenced by notes or similar instruments and were not secured by the pledge of collateral. They were carried on petitioner's books as loans payable and were not subordinated to the claims of general creditors. There was no definite arrangement as to payment of either principal or interest. Such payment was entirely dependent upon petitioner's earnings. In the opinion of Samuel Rudin, petitioner would have had no obligation to immediately repay any one of the stockholders who wanted to retire from the venture. He further believed that even if notes had been issued to the stockholders for the moneys advanced by them, *125 it would not have been possible for any one of the stockholders to transfer such a note to an outside party, thus liquidating his interest in the venture, in view of an agreement which they had entered into restricting the transfer of stock in petitioner. Although petitioner was continually pinched for funds from the time it took title in August 1945, it made regular payments on its mortgage loans. It paid off the second mortgage of $150,000 held by Standard Factors Corporation by November 14, 1946. A loan which was negotiated from Lawyers Trust Company in order to pay the Standard Factors mortgage was reduced by regular payments beginning December 1, 1946, and was finally paid by June 30, 1948. Consolidated Realty Corporation, a subsidiary of the Reconstruction Finance Corporation, was insistent upon regular payments on its mortgages. Interest and amortization were to be paid monthly on the first of each month, and if payment of taxes was not made on the first of the month, the owners of the building subject to the mortgage would receive a threat to foreclose. In 1947, the mortgage held by Consolidated Realty Corporation was refinanced by obtaining a new 4 per cent first mortgage *126 on 241 Central Park West from the Prudential Life Insurance Company, in the amount of $1,200,000, and a new second mortgage for $254,993.40, at 4 1/2 per cent interest from Consolidated Realty Corporation. Regular payments of principal were made on this new first mortgage held by Prudential Life Insurance Company during the fiscal year ended June 30, 1948, as well as on the new second mortgage held by Consolidated Realty Corporation. Petitioner's stockholders felt that the outside obligations should be paid off before their own advances were repaid. After the Standard Factors and Lawyers Trust Company mortgages had been paid, payments were made to the stockholders as follows: J. R. Schiff or
S. & E. Rudin
his Estate
S. H. Gross
M. G. Sydney
Between 7/1/48
and 12/31/48
$ 2,333.33
$ 2,333.34
$ 6,166.67
$ 6,166.66
In 1949
8,250.00
8,250.00
4,125.00
4,125.00
In 1950
15,000.00
15,000.00
7,500.00
7,500.00
In 1951
33,333.34
33,333.34
16,666.66
16,666.66
1/7/52
708.67
708.66
354.34
354.35
Total
$59,625.34
$59,625.34
$34,812.67
$34,812.67
On their Federal income tax returns for the years 1948 through 1952, Edward and Samuel *127 Rudin reported the repayments made by petitioner as repayments of loans. Petitioner accrued interest on its stockholders' advances at the rate of 10 per cent per annum, pursuant to the corporate resolution dated August 1, 1945. This was the same rate charged petitioner by Standard Factors Corporation on its $150,000 blanket second mortgage. Petitioner did not pay the interest as it accrued because it did not have sufficient funds. It paid off the principal as frequently as it could, thus reducing interest charges. Petitioner did not accrue interest on the accrued unpaid interest. Although the advances made to petitioner by its stockholders were repaid during the years 1948 through 1952, none of the interest accrued on petitioner's books with respect to such advances was paid until 1952. During the period January 7 to May 12, 1952, petitioner paid to its stockholders the following amounts which had been accrued as interest on its books: S. & E. Rudin
$ 5,541.33
S. H. Gross
2,770.66
M. G. Sydney
2,770.65
Schiff Estate
5,541.33
Total
$16,623.97 The remainder of the interest accrued by petitioner on stockholders' advances totaled $73,695.62 on January 1, 1953, and *128 had not been paid at the time of the hearing herein. In October 1953, S. H. Gross and M. G. Sydney transferred to the Rudins their stock interests in petitioner plus the right to receive the amounts which had been accrued as interest on the advances they had made to petitioner. Interest deductions were claimed by petitioner on its Federal income tax returns for the taxable years ended June 30, 1946, June 30, 1947, and June 30, 1948, in the amounts of $14,709.49, $17,371.16, and $17,995.84, respectively, with respect to its accruals of interest on stockholders' advances. Such deductions were disallowed by respondent. The advances made to petitioner by its stockholders were contributions to capital and were not loans upon which interest was properly accruable. Opinion RICE, Judge: This is another in a long line of cases involving the problem of whether cash advances to a closely held corporation by its stockholders are to be regarded, for tax purposes, as loans or as contributions to capital. Petitioner must establish that such advances created a debtor-creditor relationship between it and its stockholders if it is to be entitled to deduct, pursuant to section 23(b) of the *129 1939 Code, the amounts which it has accrued as interest on these purported loans. , affd. (C.A. 4, 1935). Petitioner corporation was organized by five individuals for the purpose of acquiring title to and operating certain rental properties. The purchase price of such properties was $1,842,478.27, and it was necessary that the stockholders invest a minimum of $150,000 over and above various mortgages, existing and to be placed on the property. The stockholders decided to limit their permanent investment in the corporation to a total of $3,000 and to withdraw the remaining $147,000 as rapidly as the earnings of the corporation would permit. Accordingly, capital stock in the amount of $3,000 was issued by the corporation, and the remaining $147,000 which was advanced by the various stockholders in amounts exactly proportionate to their equities in the corporation was denominated as loans, with interest payable thereon at the rate of 10 per cent per annum. As the needs of the business determined, additional amounts were paid in by the stockholders, generally in proportion to their stockholdings, *130 and such amounts also were treated as loans. No notes or security were given by petitioner on such "loans" and no date was specified for their repayment. The issue is one of fact. The Colony, Inc., 26 T.C. , filed April 9, 1956; , affd. (C.A. 9, 1950), certiorari denied . We must determine whether there was an intent to create, and whether the parties did create, a true debtor-creditor relationship. Many criteria have been used by the courts as aids in determining the factual question and no one, alone, is conclusive. , revd. (C.A. 7, 1944), revd. . Substance and not form is controlling. The technical name and formalities used do not preclude us from determining the true nature of the transaction. ; , on appeal C.A. 10, May 25, 1956; , on appeal C.A. 6, April 7, 1955; 1432 , *131 affd. (C.A. 2, 1947). The reason given by the participants in this venture for the limitation of their capital investment to $3,000 was that they considered the venture to be a highly speculative one which might result in the complete loss of such portions of their investment which were not repaid prior to the July 31, 1954 due-date of the $1,524,728.27 mortgage on the property, if that mortgage was not renewed or re-financed. However, we do not think this intent determinative of the issue herein. See , affd. (C.A. 2, 1951). Although it is clear that the stockholders desired their advances to be characterized as loans, and although both they and the corporation may have, in many ways, treated such advances as loans, it appears equally clear to us that their agreement was only as to mere form and that they failed to give such advances certain essential attributes. For this and other reasons stated below, they must, therefore, be regarded as contributions to capital. Although the stockholders may have desired to have their advances regarded as loans for tax and other purposes, *132 they were unwilling to give them one of the essential attributes of a loan, namely, a fixed date of repayment. The "most significant, if not the essential feature of a debtor and creditor as opposed to a stockholder relationship, [is] the existence of a fixed maturity for the principal sum with the right to force payment of the sum as a debt in the event of default." (C.A. 5, 1939). Since there were no written notes issued by petitioner as evidence of these purported loans, we must look to the terms of the oral understanding between the parties. It appears that no one of the stockholders could have demanded repayment of his loan, or any portion thereof, in advance of the time at which pro rata repayment would be made to all. It has been ably stated that "those are not creditors, who cannot withdraw from the venture without the consent of the rest, demanding a fixed sum at some period set in advance." (C.A. 2, 1937). A vague understanding that petitioner would repay these advances to its stockholders when it had the money to pay them does not satisfy this *133 requirement. All the initial advances, amounting to $147,000, represented part of the purchase price of the properties. By their very nature, they were placed at the risk of the business. Cf. They were made in exact proportion to the stock interests of the shareholders; and when it was subsequently found that additional funds were required by petitioner, the majority of such additional advances were also scrupulously made according to the exact equity interests of each of the shareholders. It thus appears that the stockholders, as a group, required each participant in the venture to maintain his proportionate equity by placing additional sums at the risk of the undertaking as such sums were required. Moreover, when Gross and Sydney sold their interests in petitioner to the Rudins in 1953, the accrued interest on their purported loans was not paid to them, but was acquired by the purchasers as an essential part of the seller's equity in petitioner. The stockholders' treatment of their nominal capital investments and the purported loans as a "single package" indicates that they recognized that both, in fact, constituted capital investment. See *134 The Colony, Inc., supra. When we examine the debt to capital ratio of this undertaking, it is simple to understand petitioner's need to tie in these purported loans with capital investment and to prevent withdrawal upon demand. The stated capital of $3,000 was wholly inadequate to finance the undertaking. Even after the stockholders had paid in an additional $147,000, it was thereafter necessary for them to advance additional sums to petitioner in order to provide it with sufficient working capital. Were we to consider the advances as loans, it would result in a debt to capital ratio of approximately 600 to one. As stated in : "When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. ; . The formal characterization as loans on the part of the controlling stockholders may be a relevant factor *135 but it should not be permitted to obscure the true substance of the transaction. ." The repayment of these advances was dependent entirely upon petitioner's future earnings. There was no other source. No security could be given for the purported loans since petitioner's properties already carried first and second mortgages. Since the stockholders could expect repayment only if the venture were successful, their advances were quite obviously risk capital rather than loans. Except for the tax advantage of interest deductions, petitioner could have achieved the same result by issuing redeemable preferred stock and, after analyzing the nature of these advances, we must regard them as such. See . Decision will be entered for the respondent.